1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )          3:07-CR-00103-LRH-VPC
                               )
    v.                         )
                               )          <u>ORDER</u>
MYRON MOTLEY,                  )
                               )
            Defendant.         )
_____ )

Presently before the court is Defendant Myron Motley's Motion to Suppress Evidence (#17[1]).  The Government filed an opposition to this motion (#24) to which Defendant replied (#25). On February 17, 19, and 24, 2008, this court held an evidentiary hearing on Defendant's motion. Following this hearing Defendant and the Government filed post-hearing memoranda (#32 & 33).

**I.      Facts and Procedural History**

Prior to December 5, 2007, Bill Ames, an employee of the Washoe County Sheriff's Office and task force officer with the Drug Enforcement Agency, surveilled Defendant as part of Ames's duties.  During this period Ames spoke with a confidential informant's relative, who told Ames Defendant was a cocaine and crack cocaine trafficker who often lived at Harrah's casino in Reno, Nevada.  According to this source, Defendant would live at Harrah's for weeks at a time but would

_____

[1] Refers to the court's docket

leave for a few days and return to resume his drug business at Harrah's.  The source also told Ames that Defendant took up to nineteen ounces of powder cocaine at a time and transferred it into rock cocaine.  Defendant would then sell the rock cocaine to middlemen, who in turn sold it to consumers.

On or about November 29, 2007, Ames spoke with Harrah's director of security regarding two incidents involving Defendant.  According to the director, on one occasion Defendant called hotel security to report he had lost the key to his room safe.  An employee told Defendant that hotel maintenance would have to remove the safe door because the hotel did not have spare keys to the safes.  Upon a maintenance worker's arrival at Defendant's room, the worker found the safe was already broken into.

The security director also reported that PBX operators at Harrah's, where Defendant was currently staying, were suspicious due to the number and times of calls to Defendant in his room. The director also reported that a person whom Defendant associated with was arrested in Harrah's for selling crack cocaine.

The security officers also told Ames that three or four years ago Defendant transacted $59,000 with Harrah's.  In 2006, this amount increased to $600,000, and in 2007, Defendant had already transacted $700,000.  Moreover, Ames observed that Harrah's paperwork concerning Defendant, which contained spaces for an employer, made no indication Defendant was employed.

On December 5, 2007, Ames witnessed Defendant's vehicle leave Harrah's and drive west on Interstate 80.  Ames called California Highway Patrol ("CHP") Truckee dispatch and requested to speak to an officer about obtaining a stop of Defendant's vehicle.  Ames then spoke with David Solari, a sergeant with CHP.  Ames told Solari that there was a vehicle traveling towards Truckee, California that was possibly connected with narcotic transactions or a large amount of cash.

Ames also spoke with CHP Officer Jim Manion while Manion was at the CHP Truckee office.  Ames told Manion that Defendant would be traveling west on I-80 in a gold Jeep Cherokee

1   and that Ames believed there were drugs in Defendant's vehicle.  Ames asked Manion to stop the

2   vehicle if he had a chance but also told Manion to develop his own independent probable cause.  At

3   this court's suppression hearing, Ames explained he asked Manion to develop his own probable

4   cause in order to "wall out" DEA's investigation from the CHP's involvement.

5           Prior to his departure from the office, Manion asked Solari to contact Officer Jerry Jacobs, a

6   CHP Truckee-area canine handler, in the event someone stopped Defendant's vehicle.  Several

7   minutes after Solari's conversation with Ames, Solari spoke with Jacobs and told him to retrieve

8   Spirit, a CHP dog trained in illegal drug detection, from Jacobs's home and also listen to his radio

9   for any stop of Defendant's vehicle.

10          Manion traveled to I-80 and waited for Defendant's vehicle to pass by.  As Manion saw

11  Defendant's vehicle approach, Manion noticed there was a large object suspended from the driver's

12  rear view mirror.  After Defendant passed Manion, Manion pulled out from his vantage point,

13  caught up to Defendant, and drove alongside Defendant's vehicle.

14          From this position Manion noticed that the vehicle's driver-side window was tinted.  Based

15  upon his knowledge of the California Vehicle Code, Manion concluded that the driver's side

16  window was illegally tinted.  Manion also observed that the object hanging from the rear view

17  mirror was a placard about the size of a placard for a disabled person or perhaps larger.[2]  Manion

18  believed the placard violated the California Vehicle Code's prohibition on driving while an object

19  obstructs or reduces the driver's clear view.  Based upon these perceived violations, Manion pulled

20  over Defendant's vehicle at 11:35 a.m.

21          After approaching Defendant's vehicle and conversing with Defendant, Manion discovered

22  that Defendant's registration was expired, and he had no proof of insurance.  Manion then directed

23  Officer Graham – who had arrived at the scene shortly after the stop – to write Defendant a citation

24

25              [2] This placard was later determined to be a 4" x 10" parking pass for a Reno casino.

26

3

1   for two violations: object from rear view mirror obstructing driver's view and no proof of insurance.
2   At 11:49, Manion ran a warrants check on Defendant in Placer and Contra Costa counties.  After
3   discovering Defendant had a possible alias, Manion also ran a DMV check and a warrant check on
4   that name.

5          Approximately forty  minutes after the initial stop, at 12:15 p.m., Jacobs arrived at the scene
6   with Spirit.  At this point Manion and Defendant were discussing the citation by Manion's vehicle.
7   After arriving, Jacobs directed Spirit to sniff the exterior of Defendant's vehicle.  While sniffing
8   near the vehicle's passenger door, Spirit stood up on his hind legs and put his head into the front
9   passenger-side window.   Spirit then continued to sniff the exterior of the vehicle but stopped at the
10  lower right corner of the seam between the driver and passenger door.  At this location, Spirit took a
11  deep sniff and began to paw aggressively at the lower rear-corner of the seam.  This was interpreted
12  by Jacobs as a definite drug alert.

13         It took approximately five minutes for Jacobs to inspect Defendant's vehicle with Spirit.
14  After observing Spirit's alert, Jacobs asked Defendant if there was any marijuana in his vehicle.
15  Defendant responded that there was not.  Jacobs then asked Defendant if there were any other drugs
16  in the vehicle.  Defendant responded that there was no marijuana in the vehicle.

17         Jacobs then conducted a warrantless search of Defendant's vehicle and found what he
18  believed were cocaine and crack cocaine.  After this discovery, Defendant asked Manion what
19  Jacobs was putting into bags.  Manion responded that he was advised it was rock cocaine.  In
20  response, Defendant said, "it's not rock, it's powder, man."

21         The Defendant was thereafter arrested by Manion and was transported to the county jail in
22  Truckee.  While en route, Defendant made statements about acquiring cocaine in Reno and how he
23  was buying cocaine everywhere he could.[3]

24  _____

25         [3] Defendant argues in his motion to suppress that he made incriminating statements while being
    transported from Truckee to Reno.  At this court's suppression hearing, the only evidence presented revealed

26

4

Ames arrived at the scene on the interstate shortly after Defendant's arrest and it was agreed that the DEA would take over with its case against the Defendant.  Upon impounding and searching Defendant's vehicle, Special Agent Dillard found a receipt for a storage locker in Reno and a key that appeared to correspond with a padlock.  DEA agents later drove to the storage locker and confirmed Defendant was renting the locker.  The agents also arranged for a drug-detection dog to sniff the storage locker.  The dog alerted to the presence of illegal drugs in the storage locker.

Dillard applied for and obtained a search warrant for the storage locker.  After obtaining the warrant, Ames and Dillard searched the locker and found a scale commonly used for weighing narcotics, packaging material commonly used to package narcotics, and crack cocaine.

Defendant brings the present motion to suppress on the basis that the evidence seized was the fruit of an unconstitutional search and seizure.  Defendant also contends he made incriminating statements without the benefit of Miranda warnings and therefore these statements must be suppressed.

**II.     Legal Standard**

Defendant seeks to exclude evidence obtained as a result of the Government's search of his vehicle on three bases: (1) he was stopped without reasonable suspicion; (2) assuming officers had reasonable suspicion, he was detained for an unreasonable amount of time; (3) there was no probable cause to search his vehicle; and (4) the Government conducted an illegal search of his vehicle when Spirit stuck his head inside the vehicle.

With regard to Defendant's first argument that he was stopped without reasonable suspicion, the Government must first satisfy a burden of production "by coming forward with 'specific and articulate facts[]' to support [its] suspicion of illegal activity."  *United States v. Willis*, 431 F.3d 709, 715 n.5 (9th Cir. 2005) (citation omitted).  Defendant then has the burden of showing

that Defendant made the statements at issue while being transported to the county jail in Truckee.

5

1  that evidence should nonetheless be suppressed because officers lacked reasonable suspicion.  *See*

2  *id.*

3      With respect to Defendant's second argument that he was detained for an unreasonable

4  amount of time, the Government carries the burden to prove its seizure was based on reasonable

5  suspicion and was sufficiently limited in scope and duration to satisfy the conditions of an

6  investigative seizure.  *Florida v. Royer*, 460 U.S. 491, 500 (1983).

7      Concerning Defendant's third argument that there was no probable cause to search his

8  vehicle, because this search was conducted without a warrant, the Government carries the burden of

9  showing the applicability of an exception to the warrant requirement imposed by the Fourth

10  Amendment.  *See Mincey v. Arizona*, 437 U.S. 385, 390-91 (1978); *Schnepp v. Hocker*, 429 F.2d

11  1096, 1099 n.5 (9th Cir.1970) ("The burden of proof of probable cause to justify a warrantless arrest

12  and search lies on the prosecution, not the defendant."); *see also* 3A Charles Alan Wright, Nancy J.

13  King & Susan R. Klein, *Federal Practice and Procedure* § 675, at 388 (3d ed. 2004) ("If the search

14  was without a warrant, the burden is on the United States to bring the case within one of the

15  exceptions to the warrant requirement . . . .").

16      Finally, with regard to Defendant's fourth argument that the Government conducted an

17  illegal search when Spirit stuck his head in Defendant's vehicle, Defendant has the burden of

18  establishing that the Government violated his legitimate expectation of privacy.  *See United States v.*

19  *Davis*, 932 F.2d 753, 756 (9th Cir. 1991).

20      Defendant also seeks to exclude statements he made during his traffic stop and his

21  subsequent transport to the county jail on the basis that they were made without the benefit of

22  Miranda warnings.  In response, the Government argues Defendant's statements were spontaneous

23  and therefore did not need to be preceded by Miranda warnings.  For the Government to prevail on

24  this theory, it must show that Defendant's statements were not the "product of words or actions on

25  the part of the police that they should have known were reasonably likely to elicit an incriminating

26

1    response." *See Innis v. Rhode Island*, 446 U.S. 291, 303 (1980); *United States v. Zahrey*, 963 F.

2    Supp. 1273, 1282 (E.D.N.Y. 1997).

3    **III.**    **Discussion**

4       **A. Probable Cause and Reasonable Suspicion to Stop**

5       The court finds Manion had probable cause to stop Defendant for a traffic violation for

6    driving with an object reducing his clear view.  Manion testified that as Defendant's vehicle

7    approached Manion's vantage point, Manion noticed there was a large object suspended from the

8    vehicle's rear view mirror.  This observation created probable cause to believe that Defendant was

9    violating California Vehicle Code § 26708(a)(2)[4] by driving while an object reduced his clear view.

10   The parking pass hanging from Defendant's rear view mirror was later determined to be 10" x 4"

11   and would have reduced the clear view of the Defendant.

12      Defendant's stop was further justified by reasonable suspicion that Defendant was involved

13   in illegal drug activity and that contraband was contained within his vehicle.  While Officer Manion

14   did not personally possess knowledge that would justify a stop to investigate whether Defendant's

15   vehicle contained contraband, facts concerning Defendant's likely drug trafficking activity are

16   imputed to Manion through the collective knowledge doctrine.

17       **1.**      **Collective Knowledge Doctrine**

18      Under the collective knowledge doctrine, a court must determine whether an investigatory

19   stop complied with the Fourth Amendment by "look[ing] to the collective knowledge of all the

20   officers involved in the criminal investigation although all of the information known to the law

21   enforcement officers involved in the investigation is not communicated to the officer who actually

22   [undertakes the challenged action]." *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007).

23      In this case, Manion possessed reasonable suspicion to stop Defendant based on Ames's

24

25       [4] This subsection reads as follows: "No person shall drive any motor vehicle with any object or material

26   placed, displayed, installed, affixed, or applied in or upon the vehicle which obstructs or reduces the driver's
clear view through the windshield or side windows."

knowledge of facts regarding Defendant's likely involvement with illegal drugs.  During this court's suppression hearing, Ames testified to the following facts relevant to his investigation of Defendant at Harrah's Hotel and Casino in late November and early December 2007:

- Ames spoke with a confidential informant's relative who told Ames that Defendant was a cocaine and crack cocaine trafficker who often stayed at Harrah's.

- The same source told Ames that Defendant took up to nineteen ounces of cocaine at a time and transferred it into rock cocaine.  Defendant would then sell the rock cocaine to middlemen, who in turn sold it to consumers.

- The source also told Ames that Defendant would live at Harrah's for weeks at a time but would leave for a few days and return to resume his drug business at Harrah's.

- Harrah's security director told Ames about an incident when Defendant called hotel security to report he had lost the key to his room safe.  By the time a maintenance worker arrived to open the safe, however, the safe was already broken into.

- The security director reported that a person whom Defendant associated with was arrested in Harrah's for selling crack cocaine.

- The security director reported that PBX operators at Harrah's were suspicious of Defendant due to the frequency and times of calls to his hotel room.

- The security director reported that three or four years ago Defendant transacted $59,000 with Harrah's.  In 2006, this amount increased to $600,000, and in 2007, Defendant had already transacted $700,000.

- Harrah's paperwork concerning Defendant, which contained spaces for an employer, made no indication Defendant was employed

Based on the information gleaned through his investigation, Ames had reasonable suspicion to believe Defendant was involved in drug selling activity.  Defendant's trip on I-80 corroborated the confidential informant's report that Defendant would leave Harrah's for a few days and then

resume his drug business.  Further, it was reasonable for Ames to believe Defendant's vehicle contained cocaine based upon the confidential informant's report that Defendant would take up to nineteen ounces of cocaine at a time, convert it into rock cocaine, and sell it to middlemen.

Having established that Ames had reasonable suspicion to believe Defendant's vehicle contained contraband, the court concludes that Ames's knowledge is imputable to Manion under the collective knowledge doctrine.  Defendant argues strenuously that Manion could not have possessed reasonable suspicion because Ames told Manion that Manion would have to develop his own probable cause to stop Defendant's vehicle.  The Ninth Circuit, however, has rejected the notion that a knowledgeable officer's communication needs to convey any substantive information in order to impute his knowledge to an arresting officer.  *See Ramirez*, 473 F.3d at 1036 n.7 ("To the extent there was a substantive communication at issue in our prior cases, we suggested only that such communication was sufficient, not necessary, to invoke the collective knowledge doctrine.").  Rather, any communication is sufficient to impute knowledge from one officer to another.  The *Ramirez* court made this point clear by rejecting United States District Court for the District of Arizona's analysis in *United States v. Newman*, 265 F. Supp. 2d 1100 (D. Ariz. 2003), where the district court required "some minimal level of information regarding probable cause be communicated among the officers in order to apply the collective rule."  *See Ramirez*, 473 F.3d at 1036 n.7; *Newman*, 265 F. Supp. 2d at 1107-08.[5]

_____

[5] The Ninth Circuit's standard is in accord with Fifth Circuit's decision in *United States v. Ibarra-Sanchez*, 199 F.3d 753 (5th Cir. 1999), where a DEA agent possessing reasonable suspicion communicated to dispatch that the arresting officers would need to form their own reasonable suspicion before stopping the defendant.  *Id.* at 757.  The dispatcher, however, omitted the knowledgeable officer's instruction that the arresting officers develop their own reasonable suspicion; instead, the dispatcher told the arresting officers only that a DEA agent had requested assistance in stopping the defendant's vehicle because it was possibly transporting drugs or weapons.  *Id.*  The Fifth Circuit held that the arresting officers had reasonable suspicion to stop the defendant, reasoning that the knowledgeable officer's directive that the arresting officers develop their own reasonable suspicion did not eviscerate the collective knowledge doctrine.  *Id.* at 759-60.  The court stated, "under the 'collective knowledge' doctrine, the [arresting] officers did not need to form their own suspicion. The admissibility of the evidence recovered during this lawful stop turns on whether [the knowledgeable officer] possessed the requisite reasonable suspicion to make the stop."  *Id.* at 760 n.6.

9

**B. Scope of Defendant's Detention**

The Supreme Court has adopted a dual inquiry for evaluating the reasonableness of an investigative stop: "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Sharpe*, 470 U.S. 675, 682 (1985).  This court has already found that the initial stop was justified based upon Manion's observation of a 4" x 10" placard hanging from Defendant's rear view mirror and the officers' collective knowledge that there was reasonable suspicion to believe Defendant's vehicle contained contraband.  An issue remains, however, whether Defendant's detention was reasonably related in scope to the circumstances that justified the traffic stop.

**1.     Disputed Facts**

The parties spent a considerable amount of time at the suppression hearing presenting evidence and argument as to how long Defendant was detained during his traffic stop.  In particular, the parties dispute when Manion pulled Defendant over and when Jacobs eventually arrived with Spirit.  The Government contends Defendant was first pulled over at 11:47 a.m.  At the suppression hearing, the Government presented Manion's testimony that based upon his review of a log detailing communications with police dispatch, Manion believes he stopped Defendant at 11:47 or 11:48.  Defendant, in response, argues that Manion's testimony is undermined by Manion's police report, Jacob's police report, Defendant's prebooking form, and Manion's probable cause declaration, which reflect that Defendant was stopped at 11:35.

After review of all the evidence, the court finds that Defendant was stopped at 11:35.  Jacobs's police report, Defendant's prebooking form, and Manion's probable cause declaration all list 11:35 as the time when Defendant was arrested or stopped.  These entries were contemporaneous with the arrest and thus more probative than Manion's testimony at the suppression hearing.

The parties also dispute when Jacobs arrived with Spirit.  The Government argues Jacobs

1  arrived at 12:08 or 12:09, based upon Jacob's testimony at the suppression hearing.  Jacobs testified

2  that upon listening to the dispatch recording of all the calls involving Defendant's arrest, Jacobs

3  believes he arrived at the scene seven or eight minutes before 12:15.  Defendant, on other hand,

4  argues that Jacobs arrived at 12:15.

5  The court finds Jacobs arrived at 12:15.  First, before Jacobs listened to the tape, both

6  Jacobs and Manion testified that Jacobs arrived on the scene at 12:15.  Second, Jacobs offered no

7  explanation why after listening to the dispatch tape he believed he arrived seven or eight minutes

8  before 12:15.  Finally, the court is greatly persuaded by the dispatch log's entry at 12:15:05, which

9  states, ".UI.80-21.U/80-K.S/ENRT.R/N[.UNT/* 80-K][.STA/ENRT]."  This entry is identical to an

10  entry at 12:02:02, which Jacobs testified reflects he was en route at 12:02.  Thus, because these two

11  entries contain identical information, the 12:15:05 entry also necessarily reflects Jacobs was still en

12  route at 12:15.[6]

13                    **2.    The Propriety of Defendant's Continued Detention**

14  Perhaps Defendant's chief argument in support of his motion to suppress is that the police

15  detained him longer than was justified by his purported violations of the California Vehicle Code.

16  Defendant argument is well taken to the extent that the police detained him to investigate a potential

17  violation of California's traffic laws.  However, Defendant's argument is not well taken to the

18  extent it does not acknowledge the police also had reasonable suspicion to believe Defendant was

19  involved in illegal drug activity and that his vehicle contained contraband.  Therefore, in order to

20  ────────────

21           [6] Solari and Jacobs both testified that the dispatch entry at 12:15:26, which states, ".UI.80-K.D/15:80-K
22  0115 AT SCENE.T/1015[.P/4]" reflects Defendant was in custody.  These witnesses testified that they believe
    dispatch transposed the first two digits of "0115" so that the entry should really read "1015," which they assert
23  would reflect Defendant was in custody.  The Government argues that this transposition shows that Jacobs
    could not have arrived at the scene at 12:15:10 because at 12:15:26 Defendant was already in custody–an event
24  that occurred only after Jacobs conducted an investigation with his Spirit and found illegal drugs.  Although
    this argument is persuasive, the Government offers no explanation why the entry at 12:15:05 reflects Jacobs
25  was still en route.  Based upon this entry and other testimony that Jacobs arrived at 12:15, the officers'
    testimony concerning the purported transposition is not sufficient to overcome the evidence showing Jacobs
26  arrived at 12:15.

1  determine whether the police unreasonably detained Defendant, this court must decide whether the

2  Defendant's seizure was sufficiently brief in view of the officers' reasonable suspicion that

3  Defendant violated the California Vehicle Code and Defendant's vehicle contained illegal drugs or

4  other contraband.

5       In *United States v. Place*, 462 U.S. 696 (1983), the Supreme Court considered whether a

6  ninety-minute seizure of a defendant's luggage was unreasonable when the police failed to act

7  diligently by having a drug-sniffing dog ready at location of the seizure.  The Supreme Court

8  recognized the relevance of two factors in determining the reasonableness of an investigative stop:

9  (1) the brevity of the invasion to an individual's Fourth Amendment interests and (2) whether the

10  police diligently pursued their investigation.  *See id.* at 709; *see also United States v. $191,910.00 in*

11  *U.S. Currency*, 16 F.3d 1051, 1059 (9th Cir. 1994) (stating that an investigatory seizure is

12  reasonable if "(1) the length of the detention is sufficiently short, and (2) government agents act

13  with diligence in pursuit of their investigation."), *superseded on other grounds by statute*, Civil

14  Asset Forfeiture Reform Act of 2000, Pub. L. No. 106-185, 114 Stat. 202, *as recognized in United*

15  *States v. $80,180.00 in U.S. Currency*, 303 F.3d 1182 (9th Cir. 2002) .  In finding the seizure went

16  beyond the limits allowed by *Terry v. Ohio*, 392 U.S. 1 (1968), the Court stated that "although we

17  decline to adopt any outside time limitation for a permissible *Terry* stop, we have never approved a

18  seizure of the person for the prolonged 90-minute period involved here and cannot do so on the

19  facts presented by this case.  *Place*, 462 U.S. at 709-10 (footnote omitted).

20       In *United States v. Sharpe*, 470 U.S. 675 (1985), the Supreme Court further discussed the

21  second factor mentioned in *Place*–whether the police diligently pursue their investigation–in the

22  context of a Fourth Amendment challenge to a twenty-minute traffic stop:

23      In assessing whether a detention is too long in duration to be justified as an investigative
stop, we consider it appropriate to examine whether the police diligently pursued a means

24  of investigation that was likely to confirm or dispel their suspicions quickly, during
which time it was necessary to detain the defendant. A court making this assessment

25  should take care to consider whether the police are acting in a swiftly developing
situation, and in such cases the court should not indulge in unrealistic second-guessing.

26

12

1    *Id.* at 686 (citations omitted).  The Court concluded the stop did not exceed the limits established by

2    *Terry* because the police acted diligently, and any delay in a defendant's arrest was the result of the

3    defendant's evasive actions.  *See id.* at 688-89.

4         The Ninth Circuit applied the guidelines established by *Place* in *United States v. Erwin*,

5    803 F.2d 1505 (9th Cir. 1986), where the court considered a Fourth Amendment challenge to the

6    police's seizure of a defendant's luggage in order to inspect it with a drug-sniffing dog.   The court

7    rejected the defendant's challenge, finding the seizure was limited in scope to the extent that it did

8    not require more than the reasonable suspicion possessed by the police.  *See id* at 1509.  The Ninth

9    Circuit reasoned that the search was reasonable under *Terry* because, among other factors, the

10   luggage was only seized for about forty-five minutes before the inspection, which the defendant

11   conceded was a "very short" period.  *Id.*

12        In contrast, in *United States v. $191,910.00 in U.S. Currency*, 16 F.3d 1051 (9th Cir. 1994)

13   the Ninth Circuit found that a two-hour detention of a passenger's luggage exceeded the limits

14   established in *Terry* when the police were not diligent in obtaining a drug-sniffing dog to inspect the

15   luggage.  In deeming the seizure unconstitutional, the court interpreted the Supreme Court's

16   decision in *Place* to require that a *Terry* stop must fall somewhere short of ninety minutes.  *Id.* at

17   1060.  Thus, the court held that the detention of the luggage for two hours was per se

18   unconstitutional absent probable cause.  *See id.*

19        Although the Ninth Circuit has not addressed whether police may detain a suspect and his

20   car for a period short of ninety minutes in order to procure a drug-sniffing dog, other circuits have

21   addressed similar scenarios and found that investigative detentions ranging from thirty-five minutes

22   to two hours are permissible while officers are diligently taking steps to obtain the dog.  *See, e.g.*,

23   *United States v. Mendoza*, 468 F.3d 1256, 1259, 1261 (10th Cir. 2006) (forty-minute detention was

24   constitutional when a drug-sniffing dog was initially fifty miles away and officers acted diligently);

25   *United States v. Maltais*, 403 F.3d 550, 557 (8th Cir. 2005) (90- to 120-minute detention was

26

1    constitutional when defendant was stopped in a remote location); *United States v. Orsolini*, 300

2    F.3d 724, 730 (6th Cir. 2002) (fifty minute detention was constitutional when thirty-five of these

3    minutes elapsed while a drug-sniffing dog was en route).

4          In view of the relevant authority and the evidence presented at the suppression hearing, the

5    court concludes Defendant's detention was constitutional.[7]  Defendant was detained for about fifty

6    minutes from the time Manion stopped him until Spirit alerted to the presence of illegal drugs in

7    Defendant's vehicle.  At least fifteen to twenty minutes of this time was consumed and attributable

8    to the traffic stop and related registration, license, and warrant checks.  The balance of the delay was

9    attributable to the time necessary for Officer Jacobs to arrive on the scene with his trained dog,

10   Spirit.

11         Jacobs was sent from the California Highway Patrol Offices to obtain Spirit at his home

12   residence even before it was known whether Manion would be able to make a traffic stop of the

13   Defendant.  Jacobs was directed to obtain the dog shortly after Ames called to the Truckee Highway

14   Patrol station.  Jacobs proceeded directly to his home and obtained the dog and went straight to the

15   location where Manion had made the traffic stop of the Defendant on the interstate.  Although these

16

---

17      [7] This court could disregard Defendant's detention and consider only the constitutionality of the seizure
18   of Defendant's vehicle.  That is, because all the drugs seized during the traffic stop were found in Defendant's
     car, any seizure of Defendant's person did not produce the evidence Defendant seeks to suppress.  However,
19   even if this court were to consider the seizure of Defendant's person apart from the seizure of his vehicle, the
     final analyses would be the same.  In *United States v. Place*, 462 U.S. 696 (1983), the Supreme Court found
20   that "the limitations applicable to investigative detentions of the person should define the permissible scope
     of an investigative detention of the person's luggage on less than probable cause."  *Id.* at 709.  The court
21   reasoned that seizure of a suspect's personal luggage from his immediate possession effectively restrains the
     person because "he is subjected to the possible disruption of his travel plans in order to remain with his luggage
22   or to arrange for its return."  *Id.* at 708.
         In the present case, seizure of Defendant's car would have the same, if not a greater, effect on
23   Defendant's ability to continue his travel plans as would a seizure of a suspect's personal luggage.  Once
     Defendant was pulled over on the interstate, it would have been difficult, illogical, and perhaps unsafe for him
24   to leave the scene without his vehicle.  Therefore, the court finds, as in *Place*, that the limitations applicable
     to investigative detentions of Defendant should define the permissible scope of investigative detentions of
25   Defendant's vehicle.  As such, the analyses concerning how long Defendant and his vehicle could be
     constitutionally seized are the same.

26

1   efforts consumed approximately forty minutes, they were clearly diligent under the circumstances.

2      **C.  Spirit's Reliability**

3          In order for the Government to invoke the "automobile exception," which allows officers to

4   search a vehicle without a warrant upon a showing of probable cause that a vehicle contains

5   contraband, *see United States v. Spires*, 3 F.3d 1234, 1237 (9th Cir. 1993), the Government must, of

6   course, demonstrate that the officers had probable cause to search Defendant's vehicle.  Defendant

7   argues the police lacked probable cause to search his vehicle because Spirit's alert was not

8   sufficiently reliable.  The court disagrees.

9          Probable cause is "a 'fair probability' that contraband or evidence is located in a particular

10  place.  Whether there is a fair probability depends upon the totality of the circumstances, including

11  reasonable inferences, and is a 'commonsense, practical question.'  Neither certain or a

12  preponderance of the evidence is required."  *United States v. Kelley*, 482 F.3d 1047, 1050 (9th Cir.

13  2007) (citation omitted).

14         Considering the totality of the circumstances, Jacobs had probable cause to believe

15  Defendant's vehicle contained illegal drugs.  In support of its contention that Jacobs had probable

16  cause to search Defendant's vehicle, the Government presented a report detailing Spirit's training.

17  This report indicates that Spirit completed a twelve-week, 280-hour class where he was trained to

18  alert aggressively by scratching, biting, barking or exhibiting other change in his behavior when he

19  detects the odor of cocaine.  Since the training course, Officer Jacobs continued to train Spirit to

20  detect cocaine on a nearly daily basis.  Spirit was recertified by the CHP on April 28, 2006.  As of

21  the time the Government prepared its report, Spirit had received over 1086 hours of training since

22  he was acquired by the CHP.

23         Defendant counters that on cross-examination Jacobs admitted Spirit has in the past falsely

24  alerted to the presence of illegal drugs.  Moreover, Jacobs admitted Spirit may alert to the presence

25  of illegal drugs when he smells a container in which illegal drugs were previously stored.  While

26                                                     15

1  this evidence shows Spirit's alerts for illegal drugs are not 100 percent accurate, the court finds that
2  the evidence presented by the Government is sufficient to show Jacobs had probable cause to
3  believe Defendant's vehicle contained illegal drugs.  In addition to the evidence regarding Spirit's
4  extensive training, the Government presented testimony by Jacobs that he asked Defendant if there
5  was any marijuana in his car to which Defendant responded that there was not.  Jacobs then asked
6  Defendant if there were any other drugs in the vehicle.  Defendant responded that there was no
7  marijuana in the vehicle.  Although Defendant's response was in some respects ambiguous, it at
8  least suggested that Defendant was evasive with respect to whether there were illegal drugs in his
9  vehicle besides marijuana.  Based upon the dog's clear alert and the totality of the circumstances,
10 the CHP officers had probable cause to believe Defendant's vehicle contained illegal drugs.

11        **D.  Spirit's Intrusion into Defendant's Vehicle**

12        Defendant also seeks to suppress the evidence found in his vehicle based on what he views
13 as an unconstitutional search when Spirit stood up on his hind legs and put his head into the front
14 passenger-side window of the unoccupied vehicle.  The court rejects Defendant's contention.

15        Jacobs testified that after this incident, Spirit continued to sniff the exterior of the vehicle
16 and stopped at the lower right corner of the seam between the driver and passenger door.  At this
17 point, Spirit took a deep sniff and began to paw aggressively at the lower-rear corner of the seam.
18 Jacobs identified this response as an alert indicating Spirit smelled narcotics.  The court finds that
19 any violation that may have occurred as a result of the dog placing his head inside the open window
20 is sufficiently distinguishable from its later clear alert near the corner of the driver's door.

21        **E.  Defendant's Post-Arrest Statements**

22        Finally, Defendant argues that his statement that "it's not rock it's powder, man" after
23 Jacobs found cocaine in his car should be suppressed because Defendant had not been given his
24 Miranda warnings at that point in time.  Defendant's argument is without merit.  The Government
25 presented uncontroverted testimony that Defendant made this statement after he asked Manion what

26

Jacobs was putting into bags.  Manion told Defendant that he was advised the substance was rock cocaine.  Defendant said in response that "it's not rock, it's powder, man."

"[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.  That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 292 (1980) (footnote omitted).  Here, Defendant's statement that "it's not rock, it's powder, man" was not in response to express questioning nor were Manion's words reasonably likely to elicit an incriminating response from Defendant.  Manion was merely responding to *Defendant's* question about what Jacobs found in Defendant's car.  In this context, Manion's should not have reasonably expected Defendant to answer Manion's answer in an incriminating manner.

Defendant also argues his statements while being transported must be suppressed because they were made before he was read his Miranda rights, and he did not waive his right to remain silent.  Again, Defendant argument is without merit.  The Government presented uncontroverted testimony that Defendant's statements were not in response to any questions officers posed to him and that there was no discussion of drug violations that preceded Defendant's statements.

**IV.     Conclusion**

Officer Manion had probable cause to conduct a traffic stop of Defendant based on Manion's observation of the placard hanging from Defendant's rear view mirror.  Moreover, based upon the collective knowledge doctrine, Manion had reasonable suspicion to believe Defendant was involved in illegal drug activity and that his vehicle contained illegal drugs or other contraband.

Defendant's stop did not exceed the limits established by *Terry v. Ohio*.  The approximate fifty-minute detention was reasonable in light of Defendant's purported traffic violation and the time required to diligently obtain a drug-sniffing dog.

1        The police had probable cause to believe Defendant's vehicle contained illegal drugs based

2  upon the collective knowledge of all the involved law enforcement officers and upon Spirit's

3  reaction to Defendant's vehicle.  The police, therefore, conducted a valid search under the

4  automobile exception to the Fourth Amendment's warrant requirement.

5        Finally, Defendant's incriminating statements to officers were not the result of any actions

6  or words that the officers should have reasonably believed would elicit an incriminating response.

7  Defendant's motion to suppress is therefore denied.

8        IT IS THEREFORE ORDERED that Defendant's motion to suppress (#17) is denied.

9        IT IS SO ORDERED.

10        DATED this 21st day of May, 2008.

 

 

                          _____

                          LARRY R. HICKS
                          UNITED STATES DISTRICT JUDGE